IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 22, 2025 Session

## DWIGHT RANDALL WALTON v. STATE OF TENNESSEE

Appeal from the Criminal Court for Sullivan County
No. C67,141        James F. Goodwin, Jr., Judge

_____

### No. E2024-00260-CCA-R3-PC

_____

In 2012, a Sullivan County jury convicted the Petitioner, Dwight Randall Walton, of four counts of rape of a child, two counts of sexual exploitation of a minor, and one count of aggravated sexual battery. For these convictions, he received an effective sentence of fifty years in the Tennessee Department of Correction. *State v. Walton*, No. E2014-02319-CCA-R3-CD, 2015 WL 5554573, at *1 (Tenn. Crim. App. Sept. 21, 2015), *no perm. app. filed.* On direct appeal, this court concluded that the evidence was sufficient to support each conviction, except the aggravated sexual battery conviction. *Id.* Concluding that the evidence was insufficient to support the aggravated sexual battery conviction, we reversed and dismissed that conviction. Thereafter, the Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel. The post-conviction court denied his petition after a hearing. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and KYLE A. HIXSON, JJ., joined.

Joseph W. McMurray, Kingsport, Tennessee, for the appellant, Dwight Randall Walton.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Matthew W. Darby, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts and Background**

This case arises from the Petitioner's sexual abuse of the seven-year-old victim, with whom he lived along with the victim's mother and brother. The Petitioner was

responsible for caring for the victim and her brother while their mother worked. On direct appeal, this court summarized the facts of the case as follows:

United States Marshal Mike McCoy testified that he had previously been employed by the Bristol Police Department where he was responsible for investigating child abuse and sexual abuse cases. He was assigned to the instant case on November 14, 2008, and on that date, he observed as Amy Bachman of the Children's Advocacy Center interviewed the victim, a seven-year-old girl. After the interview, he spoke with the victim's mother, K.M., and asked for her consent to search the family's home in Bristol, Tennessee. The police took photographs of the home and collected a camera, a memory card for the camera, and couch cushions. Marshal McCoy said that he did not find any information or photographs relevant to his investigation on the camera or its memory card. Marshal McCoy testified that the family's home was divided into two residences with no inside access between the residences. Photographs of the house depict a single story residence with a basement apartment.

Bristol City Schools employee Scott Latham testified that classes commenced on August 11 for the 2008–2009 school year. Through Mr. Latham's testimony, the State submitted the victim's school record as evidence. The record indicated that on August 11, 2008, the victim was enrolled at Holston View Elementary School in the second grade. The record also contained a picture of the victim and the names and addresses of her parents.

The victim testified that she was born in June 2001 and was twelve years old at the time of trial. The victim recalled that in June 2008, she and her family moved to her grandmother's house in Bristol, Tennessee. Her mother was married to [the Petitioner] at the time, and the family unit consisted of her mother, [the Petitioner], her brother, and herself. They lived in the downstairs unit of the house while her grandmother lived upstairs. The victim testified that she was eight years old when she moved and that the move occurred near her birthday. Her mother worked during the day, and [the Petitioner] cared for the victim and her brother.

The victim recalled that during this time period, [the Petitioner] made her watch movies with him. She said that the movies featured men and women having sexual intercourse. The victim testified that she tried to run to another location in the house because she did not want to watch the movies but that [the Petitioner] told her to sit next to him on the couch. She stated that he made her watch the movies more than twice. On one of those occasions, [the Petitioner] placed one hand inside his pants and moved his hand "up and down." His other hand was either next to him or touching her.

2

The victim testified that one day while her mother was at work, [the Petitioner] asked her to put on a pair of her mother's thong underwear. After she complied, he took photographs of her posing in the underwear. She said that she was not wearing anything other than the underwear. The victim explained that some of the poses that [the Petitioner] asked her to do for the photographs were similar to what she had seen in the movies and that she knew what the poses were because of the movies.

The victim testified that the same day, [the Petitioner] put his finger "[i]n [her] butt." She said that it caused her pain. [The Petitioner] stopped when she told him that it hurt. She testified that [the Petitioner] said that if she told anyone, she would not see his side of the family again. The victim said that she would have been upset not to see Granny Rowland or Grand–Jack again.

The victim said that after school started, [the Petitioner] made her watch movies with him again two or three times and that those movies showed naked men and women having sexual intercourse. She testified specifically that one time he put one hand inside his pants and moved it "[u]p and down" and that every time they watched such movies he put one hand inside his pants. He also had her pose in thong underwear again and took more photographs. She testified that he deleted the photographs after taking them. On the day that he took the photographs, he also kissed her "all over" her body and placed his tongue "[i]n [her] vagina."

The victim testified that one day after school, [the Petitioner] told her to put his penis in her mouth. She said that they were in the living room, and she was sitting on the floor. She complied, and she recalled that "[s]tuff came out" of his penis that she then spit onto the couch. [The Petitioner] immediately cleaned the couch.

On cross-examination, the victim testified that her family had been living in Texas before moving to Tennessee in the middle of the summer of 2008. They lived in Texas because [the Petitioner] was stationed at Fort Hood. The victim recalled that the movies [the Petitioner] made her watch were on DVDs. She did not know where he stored the movies. The victim said that she and her younger brother were alone with [the Petitioner] while her mother worked. Her younger brother was around two years old at the time and was walking some and beginning to talk. Her brother would be "running around" during the incidents to which she had testified. The victim replied affirmatively when asked whether [the Petitioner] had specifically mentioned Grand–Jack and Granny Rowland as people she would not be able to see if she disclosed the incidents. The victim stated that she believed they were [the Petitioner's] grandparents. The victim testified that [the

3

Petitioner's] penis was hard when he put it in her mouth and that the substance coming out of his penis was white. She said that he was sitting in the middle of the couch during this incident and that she spit the white substance out toward the end of the couch but could not remember which side. The victim said that her grandmother was generally at home, in the upstairs portion of the house, during these incidents. The victim testified that the camera used by [the Petitioner] was silver. She agreed that he deleted the pictures he took and stated that he deleted the pictures ten to fifteen minutes after taking them. The victim testified that she told her mother about the incidents sometime between Thanksgiving and Christmas. When asked why she told her mother about these things, she replied that her mother had asked her.

Tennessee Bureau of Investigation ("TBI") Special Agent Keith Proctor, the supervisor of TBI's DNA and serology section, was accepted by the court as an expert in DNA and serology analysis. He testified that he analyzed three couch cushions, labeled as right, middle, and left, for the presence of semen. Semen was located on the right cushion but not the other two. Agent Proctor visually confirmed that sperm cells were present on the right cushion. He then separated the sperm cells from the non-sperm cells. The DNA from the sperm cells matched [the Petitioner's] DNA profile. The DNA from the non-sperm cells represented a mixture of genetic material. Agent Proctor testified that the major contributor of the mixture matched [the Petitioner's] DNA and the minor contributor was consistent with the victim's DNA. He tested other locations of the cushion but found that the DNA was insufficient or degraded.

On cross-examination, Agent Proctor testified that, regarding the victim's DNA on the couch cushion, he could not identify from what bodily fluid the DNA originated. He also could not identify how old the DNA was. He agreed that a mixture of DNA is possible when fluids are deposited in the same place at different times.

Jessica Swiney testified that she had been friends with [the Petitioner] since high school and friends with the victim's mother, K.M., since K.M. began dating [the Petitioner]. At the end of 2008 or the beginning of 2009, she talked to K.M. and learned that K.M. and [the Petitioner] had separated. As a result of that conversation, she spoke with [the Petitioner] in person at his parents' house. [The Petitioner] told her

> that he made [the victim] lick his penis and that it was like a crack addiction. He didn't like doing it but he couldn't help it and that he wished he could get help but he couldn't tell, he couldn't talk to his counselor about it because she was bound

4

by law to tell, to report him.

Ms. Swiney testified that she asked [the Petitioner] how he had prevented the victim from telling K.M. [The Petitioner] responded that he told the victim "that he loved her and that there would be nobody to pay the bills if he wasn't around."

*Walton*, 2015 WL 5554573, at *1-3.

Based upon this evidence, the jury convicted the Petitioner of four counts of rape of a child, two counts of sexual exploitation of a minor, and one count of aggravated sexual battery. The Petitioner filed an appeal raising the issue of sufficiency of the evidence and a *Batson* issue, along with several other issues. This court concluded that there was no evidence presented to support the Petitioner's conviction for aggravated sexual battery in count three and dismissed the conviction. *Id.* We affirmed his remaining convictions and found no other errors. *Id.*

## II. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel because trial counsel had: (1) failed to preserve the *Batson* issue for appeal; (2) failed to excuse a juror for cause; (3) failed to object to the State's closing argument; and (4) failed to hire a DNA expert. An amended petition added a claim pursuant to the Post-Conviction DNA Analysis Act.

At the hearing on the petition, the following evidence was presented: Trial counsel ("Counsel") testified that he represented the Petitioner at trial and had experience with DNA evidence and technicians from his past trials. When asked about jury selection, Counsel recalled that one of the potential jurors knew a law enforcement officer connected to the case. He did not remember if he questioned the juror about any potential bias, but Counsel did recall discussing the selection of the jury with the Petitioner and obtained his written approval to select the final jury. When asked about his failure to object during the State's closing argument at the Petitioner's trial, Counsel stated:

Generally, from my experience in trying cases, if you object to something you call attention to it with the jury, and you want to be very careful on a closing argument about what you object to because you don't want to call attention to something the State's saying. . . . I didn't feel like [the State's comment that the evidence against the Petitioner was overwhelming] was the type of thing that was earth shattering[.]

Counsel confirmed that he made a strategic decision not to object during the State's argument. Regarding DNA evidence, Counsel stated:

I think the proof at trial was that the minor [DNA] contributor was consistent with [the victim]. Given [the Petitioner's] explanation, that he'd masturbated on the couch and that's why his sperm was there, it's not inconceivable that [the victim's] DNA would be on the couch in their family home.

On cross-examination, Counsel testified that when he was appointed to represent the Petitioner, he had tried upwards of forty jury cases, including four death penalty cases. When he met with the Petitioner, it was his practice to review the indictment, evidence, and discovery file with him, as well as the State's witness list. Counsel recalled discussing the charges with the Petitioner and believed that the Petitioner was not taking them seriously. He recalled a defense theory about the victim's claim that the Petitioner had threatened the victim with cutting off her time with family members, including a specific relative. However, when the victim made her accusations, that specific family member was deceased, and Counsel made that fact a large part of the defense theory that the victim was fabricating the story.

Counsel recalled that he specifically would have asked for the Petitioner's input about the jury and had the Petitioner sign off on each one. Counsel recalled that his motion to dismiss Count one of the indictment was granted based on insufficient evidence. He also recalled cross-examining the State's DNA expert and felt that the expert gave a clear and understandable explanation to the jury. On redirect, Counsel explained that it was likely that both the victim's and the Petitioner's DNA would have been on the couch in the family home through touch. He recalled asking the State's expert if the DNA could have been transferred to the sofa through sweat and that the expert agreed there were lots of ways that the DNA could have been transferred by the various occupants of the home.

The Petitioner testified that he did not see the results of the DNA testing until his sentencing hearing. He did not remember going over it with Counsel prior to trial. He stated that he was terrified about his charges and had not been in trouble with the law prior to these changes. On cross-examination, the Petitioner agreed that he had been charged in a separate case involving the same victim with exploitation of a minor. He pleaded guilty to that charge and was sentenced to time served. He stated that his semen was found on the family couch because he masturbated there and had intercourse with his wife there.

Keith Proctor, a special agent forensic scientist with the TBI in the crime laboratory in the forensic biology unit, testified as an expert in forensic biology. He stated that, based on current TBI analytical protocols, which had changed since trial, he could only conclude that the "minor contributor" of the DNA present on the sofa was an "inconclusive" match to the victim. He did say, however, that the DNA was "consistent" with the victim, under prior and current protocols. He clarified that the victim was not excluded as a possible contributor. Agent Proctor clarified that he took samples from three of the sofa cushions on which he found "quite a bit" of sperm.

At the conclusion of the hearing, the post-conviction court issued an order denying the petition. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel when Counsel: (1) failed to preserve a *Batson* issue for appeal; (2) failed to excuse a potential juror for cause; (3) failed to object during the State's closing argument; and (4) failed to call a DNA expert to testify. He also claims that he should have been granted relief pursuant to the Post-Conviction DNA Analysis Act. The State responds that the petition was properly denied because the evidence was that Counsel was prepared for trial and pursued a valid strategy. The State further responds that the Petitioner failed to establish the factors required for relief pursuant to the Post-Conviction DNA Analysis Act.

### A. Ineffective Assistance of Counsel

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. §40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this court, with no presumption of correctness. *Id.* at 457. "Where a petition conclusively shows that the petitioner is entitled to no relief, it is properly dismissed without the appointment of counsel and without an evidentiary hearing." *Givens v. State*, 702 S.W.2d 578, 580 (Tenn. Crim. App. 1985).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be

7

said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

### 1. *Batson* issue

The Petitioner claims that Counsel was ineffective for failing to preserve a *Batson* issue for direct appeal. The State responds that the Petitioner did not present any evidence on this issue at the post-conviction hearing and thus cannot establish prejudice or deficiency. We agree with the State.

The post-conviction court, in its order denying relief, concluded:

#### (1)(a) Trial counsel's failure to preserve the *Batson* issue for direct appeal

[The] Petitioner complains that trial counsel is ineffective for failing to preserve the *Batson* issue for direct appeal. [The] Petitioner offered no proof regarding this issue during the post-conviction hearing. Alternatively, this issue raised by [the] Petitioner had been previously determined by the trial court or the Court of Criminal Appeals, or the Petitioner has failed to state in the petition why the ground for relief was not previously presented in any earlier proceeding. For these reasons, this ground is dismissed.

A ground for relief is said to have been "waived" when the petitioner "knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." *House v. State*, 911 S.W.2d 705, 710 (Tenn. 1995). The Petitioner did not present evidence of this claim at the post-conviction hearing, thereby waiving it for consideration at this stage when it could have been presented in the earlier proceeding. As such, the evidence does not preponderate against the post-conviction court's ruling, and the Petitioner is not entitled to relief.

### 2. Counsel's Trial Strategy

8

The Petitioner claims that Counsel was ineffective for failing to strike a juror for cause because of her potential bias, for failing to object during the State's closing argument, and for failing to procure a DNA expert. The State responds that the Petitioner has not shown that Counsel failed to act strategically with regards to his representation of the Petitioner.

The post-conviction court concluded:

### (1)(c) Trial counsel's failure to have biased juror excused for cause

[The] Petitioner complains that trial counsel is ineffective for failing to have a biased juror excused for cause. During the post-conviction hearing, [Counsel] was asked about a potential juror that she knew some of the officers involved in the case. [Counsel] testified that he is sure he discussed this juror with [the] Petitioner. [Counsel] pointed out that it is his practice to have his clients sign each juror challenge sheet prior to it being tendered to the court. Exhibit #1 to the hearing bears out [Counsel's] testimony that [the] Petitioner signed each sheet. Additionally, a review of all of the jury challenge sheets shows that [the] Petitioner had at least three preemptory challenges remaining when both parties accepted the jury. The Court finds that [Counsel], in consultation with [the] Petitioner, made a reasonable decision as part of their trial strategy to accept the jury as constituted on the 10th round of preemptory challenges and specifically that [C]ounsel did discuss this decision with [the] Petitioner. The Court does not find proof of deficient performance, nor does the Court find any prejudice at trial, as the Petitioner offered no proof of prejudice with regard to this issue at the post-conviction hearing. Therefore, this issue is without merit and is dismissed.

. . . .

### (1)(e) Trial counsel's failure to object to prosecutorial misconduct during voir dire and closing arguments

[The] Petitioner complains that [Counsel] is ineffective for failing to object to prosecutorial misconduct during voir dire and closing arguments. [The] Petitioner's counsel at the post-conviction hearing asked [Counsel] about three specific statements made by the prosecutor during closing argument. The first statement was that "the evidence in this case is overwhelming and it is beyond a reasonable doubt that the defendant did each and every offense he is charged with." The second was that "the defense is in essence ignoring the evidence." The third was that "the minor contributor was S.M., that is the proof in this case." [Counsel] testified with regard to objecting during

closing argument in general that in his experience you just end up calling attention to the point they were trying to make. With regard to the first statement, [Counsel] testified that the only thing in his opinion that was objectionable was the word "overwhelming." He didn't find it earth shattering that the prosecutor would argue the evidence was overwhelming. Regarding the third statement, [Counsel] explained that given the Petitioner's explanation of how his semen got on the couch and the fact that S.M. resided in the residence, he didn't see that as an issue. The Court finds that [Counsel's] decision not to object during closing was a reasonable part of their trial strategy. The Court does not find proof of deficient performance, nor does the Court find any prejudice at trial, as the Petitioner offered no proof of prejudice with regard to this issue at the post-conviction hearing. Therefore, this issue is without merit and is dismissed.

. . . .

### (i)(g) Trial counsel's failure to ask for or procure an expert witness in the field of DNA

[The] Petitioner complains that [Counsel] is ineffective for failing to ask for or procure an expert witness in the field of DNA. [Counsel] testified that he prepared for his cross examination of Mr. Proctor, the state's forensic biology expert. [Counsel] testified that he questioned him about whether or not the sample on the couch could have been contaminated, whether it was from touch DNA, whether it was possible that it could have been from sweat, the fact that he could not determine which substances were mixed, and what type of bodily fluids the DNA was from. [The] Petitioner testified that he told the jury that his semen could have been on the couch from masturbation or from having intercourse with his ex-wife. [The] Petitioner further testified that he told the jury that he did not do the acts he was accused of. [Counsel] testified that he pointed out to the jury that since the victim lived in the residence, it would be reasonable to believe that her DNA would be on the couch too. It is obvious from the trial transcript and the testimony at the post-conviction hearing that the defense at trial was that [the] Petitioner did not have sexual contact with S.M. and that his DNA and his semen were on that couch for other reasons. The Court finds that [Counsel's] decision not to procure a DNA expert was a reasonable part of their trial strategy. The Court does not find proof of deficient performance, nor does the Court find any prejudice at trial, as the Petitioner offered no proof of prejudice with regard to this issue at the post-conviction hearing. Therefore, this issue is without merit and is dismissed.

The Petitioner did not seek relief pursuant to §40-30-300 et seq. regarding

the DNA issue. T.C.A. §40-30-304 states the court shall order DNA analysis if it finds that (3) the evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis. In this case the issue is the degree of certainty of the minor contributor. Mr. Proctor testified that there were alleles in the sample that were lower than the calling threshold, he further testified that had any of them excluded S.M. as a contributor, that information would have been included in his report. He further testified that even at trial today, he would say the results were inconsistent but not excluded. Additionally, the trial transcript includes the testimony of Jessica Swiney that [the] Petitioner admitted to her that he committed sex acts with the victim and that it was like a crack addiction. Therefore, it is the opinion of this Court that DNA analysis now would not resolve an issue not previously resolved by testing.

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell,* 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns,* 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State,* 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp,* 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic,* 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State,* 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House,* 44 S.W.3d at 515 (quoting *Goad v. State,* 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State,* 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694; *Harris v. State,* 875 S.W.2d 662, 665 (Tenn. 1994).

Counsel testified at the post-conviction hearing that the juror, who indicated "bias" during voir dire, in fact only indicated that she knew one or two of the law enforcement officers involved in the case. The prospective juror stated that her knowledge would not affect her judgment or her ability to sit on the jury as an impartial trier of fact. Accordingly, after consulting with the Petitioner, Counsel did not move to excuse her from the jury, a decision he testified the Petitioner took part in making. We conclude that the Petitioner has not shown that Counsel was deficient in this regard. Counsel made the informed judgment, after consulting with the Petitioner, that the juror had not indicated an amount of bias that would preclude her from properly serving on the jury. With the Petitioner's assent, Counsel elected not excuse her.

Further, Counsel's decision not to object during closing arguments, based on his years of experience that doing so would unnecessarily draw the jury's attention to the statement, was a strategic and tactical choice based on adequate preparation. Finally, with regard to Counsel's decision not to call a separate DNA expert, Counsel testified that he made the decision to rely heavily on cross-examination of the State's expert, during which the expert admitted that the results were somewhat inconclusive to establish whether the DNA was transferred through touch or other methods. This, he stated, was as much as any outside expert could have stated and he felt it was beneficial to have the State's witness reveal that fact to the jury, another strategic and tactical decision on Counsel's part. For these reasons, the Petitioner has not met his burden of proving by clear and convincing evidence that Counsel was deficient when he made certain strategic decisions during trial, and he is not entitled to relief.

Finally, the Petitioner cannot show that any of Counsel's decisions prejudiced him. There has been no evidence presented that Counsel's decision not to excuse this juror, not to object to the State's comments during argument, and not to call an independent expert would have produced a different result in the outcome of the trial. The Petitioner is not entitled to relief.

## B. Post-Conviction DNA Analysis Act

The Petitioner lastly contends that he is entitled to relief pursuant to the Post-Conviction DNA Analysis Act because newer testing procedures could have excluded the victim as a contributor of the DNA found on the sofa. The State responds that the State's expert testified that, in light of changes made to DNA testing and analysis protocols, the conclusions based on the genetic profile of the victim would still indicate that the DNA sample on the sofa was consistent with her DNA profile. The State further contends that, as a witness testified that the Petitioner admitted to her that he had sexually abused the victim, any changes in the DNA analysis would not be sufficient to overcome the proof of his guilt. We agree with the State.

12

The Post-Conviction DNA Analysis Act allows for defendants convicted of certain homicide and sexual offenses to request post-conviction DNA testing at any time. T.C.A. § 40-30-303. The post-conviction court, after allowing the prosecution to respond, must order a DNA analysis if it finds each of the following:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

*Id.* § -304.

In addition, the court may order DNA analysis if it finds "[a] reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction," and the petitioner has satisfied requirements (2), (3), and (4) listed above. *Id.* § -305. Under both the mandatory and discretionary provisions, the petitioner must satisfy all four requirements before the court will order DNA analysis. *See Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011). Failure to meet any of the four criteria is fatal to the action. *See Buford v. State*, No. M2002-02180-CCA-R3-PC, 2003 WL 1937110, at *6 (Tenn. Crim. App. Apr. 24, 2003), *no perm. app. filed.*

On review of the denial of a petition, we afford "considerable discretion" to the post-conviction court's decision. *Rucker v. State*, No. M2018-00987-CCA-R3-PC, 2019 WL 325046, at *4 (Tenn. Crim. App. Jan. 23, 2019), *no perm. app. filed.* We will only reverse the post-conviction court where its judgment is "not supported by substantial evidence." *Id.*

Here, Petitioner has failed to establish that a reasonable probability exists that he would not have been prosecuted or convicted if exculpatory results were obtained through DNA analysis. Given the nature of the evidence and the witness's testimony that the Petitioner admitted guilt, we cannot conclude that Petitioner would not have been prosecuted even if exculpatory DNA evidence was available. T.C.A. § 40-30-304(1). Accordingly, the Petitioner is not entitled to relief.

13

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_s/ Robert W. Wedemeyer_
ROBERT W. WEDEMEYER, JUDGE